**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARQUESE GAINES** | : | |
| QN-7646 | : | |
| SCI Benner Township | : | |
| 301 Institution Drive | : | |
| Bellefonte, PA 16823 | : | **CIVIL ACTION** |
| | : | |
|      Plaintiff, | : | **-cv-** |
| | : | |
|      v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| **WELLPATH, LLC** | : | |
| 600 North 12th Street, Suite 100 | : | |
| Lemoyne, PA 17043, | : | |
| | : | |
| **JACQUELINE HOWARD, M.D.** | : | |
| Medical Director | : | |
| SCI Benner Township | : | |
| 301 Institution Drive | : | |
| Bellefonte, PA 16823, | : | |
| | : | |
| **BRADLEY BOOHER** | : | |
| Superintendent | : | |
| SCI Benner Township | : | |
| 301 Institution Drive | : | |
| Bellefonte, PA 16823, | : | |
| | : | |
| **MORRIS L. HOUSER** | : | |
| Deputy Secretary for the Eastern Region | : | |
| Pennsylvania Department of Corrections | : | |
| 1920 Technology Parkway | : | |
| Mechanicsburg, PA 17050, | : | |
| | : | |
| **JOHN DOE 1** | : | |
| Corrections Officer | : | |
| SCI Benner Township | : | |
| 301 Institution Drive | : | |
| Bellefonte, PA 16823, | : | |
| | : | |

1

**JOHN DOE 2**                          :
Corrections Officer                     :
SCI Benner Township                     :
301 Institution Drive                   :
Bellefonte, PA 16823,                   :
                                        :
**JOHN DOE 3**                          :
Corrections Officer                     :
SCI Benner Township                     :
301 Institution Drive                   :
Bellefonte, PA 16823,                   :
                                        :
**JOHN DOE 4**                          :
Corrections Officer                     :
SCI Benner Township                     :
301 Institution Drive                   :
Bellefonte, PA 16823,                   :
                                        :
**JOHN DOE 5**                          :
Corrections Officer                     :
SCI Benner Township                     :
301 Institution Drive                   :
Bellefonte, PA 16823,                   :
                                        :
**PRIMECARE MEDICAL, INC.**             :
3940 Locust Lane                        :
Harrisburg, PA 17109,                   :
                                        :
**TAMER BEHMAN, MD**                    :
PrimeCare Medical, Inc.                 :
Montgomery County Correctional Facility :
60 Eagleville Road                      :
Eagleville, PA 19403,                   :
                                        :
        Defendants.                     :

## PLAINTIFF'S COMPLAINT

### I.        PRELIMINARY STATEMENT

1.      This is a civil rights action for monetary damages brought pursuant to 42 U.S.C. §§ 1983

and 1988 as well as the Eighth and Fourteenth Amendments to the United States Constitution and

raising supplemental state-law claims related to Defendants' deliberate indifference in failing to

approve and ensure that Plaintiff receive necessary medical care from December 2020 to the present time while he was incarcerated at the Montgomery County Correctional Facility ("MCCF") through March 21, 2020, and at the State Correctional Institution at Benner Township ("SCI Benner Township") from June 2022 to the present, and their deliberate indifference in failing to protect Plaintiff during transport in an Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131 through 12134, compliant and safe manner and failing to provide Plaintiff with proper accommodations and equipment under the ADA.

2.      Due to Defendants' decisions, which caused an approximately four-year ongoing delay in getting Plaintiff necessary treatment and appropriate physical and occupational therapy for neurological issues, Plaintiff has suffered severe pain, deterioration of mobility, a meniscus tear, tremors, incontinence, and an inability to control his body's maneuverability. Furthermore, while housed at SCI Benner Township, because of the Defendants' failure to protect Plaintiff during transportation, refusal to provide ADA compliant accommodations and equipment, and their deliberate indifference, Plaintiff suffered pain, knee injury, head, back and shoulder injury, and post-traumatic stress.

3.      Plaintiff now seeks damages for the substantial pain and suffering caused by Defendants' conduct.

## II.    JURISDICTION & VENUE

4.      The allegations set forth in paragraphs 1 through 3 are incorporated as if fully set forth herein.

5.      The Court has jurisdiction over the subject matter of this complaint under 42 U.S.C. §

1983 and based upon 28 U.S.C. §§ 1331 and 1343 (a) (3); pendent jurisdiction of this Court to consider claims under state law; and supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear and adjudicate state law claims.

6.      Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b) (2) because events and omissions giving rise to some of the claims, specifically those claims that occurred at MCCF, located in Eagleville, Pennsylvania, are within the Eastern District of Pennsylvania.

### III.     PARTIES

7.      The allegations set forth in paragraphs 1 through 6 are incorporated as if fully set forth herein.

8.      Plaintiff, Marquese Gaines, who is 33 years old, was at all times relevant to this complaint, an inmate at MCCF, the State Correctional Institution at Smithfield ("SCI Smithfield"), the State Correctional Institution at Camp Hill ("SCI Camp Hill"), the State Correctional Institution at Mercer ("SCI Mercer"), and the State Correctional Institution at SCI Benner Township ("SCI Benner Township").

9.      Defendant Wellpath, LLC ("Wellpath"), which has a regional office in Cumberland County, Pennsylvania, was at all times relevant to this complaint the holder of a contract to provide medical services to inmates at all Pennsylvania state correctional institutions, including SCI Benner Township.

10.     Defendant Dr. Jacqueline Howard ("Howard"), who acted under color of state law, was at all times relevant to this complaint employed as a doctor for Defendant Wellpath and assigned to provide medical services at SCI Benner Township. She is sued in her individual capacity.

11.      Defendant, PrimeCare Medical, Inc. ("PrimeCare"), with a principal place of business in Harrisburg, Pennsylvania, which operates under color of state law, was at all times relevant to this

complaint, the holder of a contract to provide health care to inmates at the medical department of MCCF and responsible for adopting policies and implementing procedures and practices in regard to providing medical services for inmates there.

12.    Defendant Dr. Tamer Behman ("Behman"), who acted under color of state law, was at all times relevant to this complaint employed as a doctor for Defendant PrimeCare and assigned to provide medical services at MCCF. He is sued in his individual capacity.

13.    Defendant, Morris L. Houser ("Houser"), who was the Superintendent of SCI Benner Township from 2021 until on or about February 1, 2024[1], and as such, oversaw the training of corrections officers at SCI Benner Township in the rules, regulations and best practices of transporting inmates. Further, defendant Houser was responsible for ensuring that DOC employees at SCI Benner Township complied with ADA regulations pertaining to the housing and care of inmates. He is sued in his individual capacity.

14.    Defendant, Bradley Booher ("Booher"), was the Superintendent of SCI Benner Township at all times relevant to the complaint from on or about February 1, 2024, until the present and, as such, oversees the training of corrections officers at SCI Benner Township in the rules, regulations and best practices of transporting inmates. Further, he was responsible for ensuring that DOC employees at SCI Benner Township complied with ADA regulations pertaining to the housing and care of inmates. He is sued in his individual capacity.

15.    Defendant, John Doe 1, is an employee of the Pennsylvania Department of Corrections at SCI Benner Township and, as a corrections officer, was responsible for the safe transportation of inmates. She/he is sued in her/his individual capacity.

---

[1] On February 1, 2024, it was announced that defendant Houser was being appointed as a regional deputy secretary for the Department of Corrections.

16.     Defendant, John Doe 2, is an employee of the Pennsylvania Department of Corrections at SCI Benner Township and, as a corrections officer, was responsible for the safe transportation of inmates. She/he is sued in her/his individual capacity.

17.     Defendant, John Doe 3, is an employee of the Pennsylvania Department of Corrections at SCI Benner Township and, as a corrections officer, was responsible for the safe transportation of inmates. She/he is sued in her/his individual capacity.

18.     Defendant, John Doe 4, is an employee of the Pennsylvania Department of Corrections at SCI Benner Township and, as a corrections officer, was responsible for the safe transportation of inmates. She/he is sued in her/his individual capacity.

19.     Defendant, John Doe 5, is an employee of the Pennsylvania Department of Corrections at SCI Benner Township and, as a corrections officer, was responsible for the safe transportation of inmates. She/he is sued in her/his individual capacity.

## IV.     FACTUAL ALLEGATIONS

20.     The allegations set forth in paragraphs 1 through 19 are incorporated as if fully set forth herein.

### A.     The Contract Between Defendant PrimeCare Medical, Inc. and the Montgomery County Correctional Facility.

21.     From 2019 to the present, Defendant PrimeCare had a contract with MCCF that granted PrimeCare the exclusive right to supply medical doctors, certified registered nurse practitioners, physician assistants, and other medical staff to MCCF to provide medical care for inmates at MCCF.

22.     The contract provided that MCCF would pay Defendant PrimeCare a set amount of money in each calendar year to provide medical services at MCCF.

23.     Upon information and belief, under the contract, Defendant Behman held the exclusive authority to determine whether MCCF patients should be referred for off-site medical services, including for specialized medical care and surgical procedures.

**B.      The Contract Between Defendant Wellpath and the Pennsylvania Department of Corrections.**

24.     From 2022 to the present, Defendant Wellpath had a contract with the Pennsylvania Department of Corrections ("DOC") that granted Wellpath the exclusive right to supply medical doctors, certified registered nurse practitioners, physician assistants, and other medical staff to the DOC, which includes SCI Benner Township.

25.     The contract provided that the DOC would pay Defendant Wellpath a set amount of money in each calendar year to provide medical services to inmates at SCI Benner Township.

26.     Upon information and belief, under the contract, Defendant Howard and any other prior or subsequent medical directors, held the exclusive authority to determine whether SCI Benner Township inmates should be referred for off-site medical services, including for diagnosis, treatment and surgical procedures.

**C.      Medical Treatment Provided at the Montgomery County Correctional Facility for Plaintiff's Undiagnosed Neurological Condition**

27.     On or about September 25, 2019, Plaintiff was arrested and transported to MCCF.

28.     Plaintiff remained incarcerated at MCCF until his transfer to the Department of Corrections to serve a state sentence on or about March 21, 2022.

29.     During his time at MCCF, Defendant Behman diagnosed Plaintiff with Parkinsonism and dementia.

30.    Parkinsonism is a broad-based term that encompasses a clinical syndrome[2] and can be a manifestation of various neurodegenerative diseases.

31.    The symptoms of Parkinsonism are issues with the body's motor system resulting in rigidity, tremors, bradykinesia, and unstable posture, leading to profound gait impairment.[3]

32.    Parkinsonism can consist of both hyperkinetic and hypokinetic movement issues.[4]

33.    Dementia is the loss of cognitive functioning, such as thinking, remembering, and reasoning. This loss of functioning is so severe that it interferes with an individual's daily life and activities. This cognitive decline usually affects people over the age of sixty-five (65). When younger individuals are affected, it is considered early onset of dementia.[5]

34.    During 2020, Plaintiff was having issues with high blood pressure, bloody stools, tonsilitis, and a lump on the right side of his throat (possible inflammation of a lymph node) and went to the MCCF medical deparatment numerous times due to these concerns. Plaintiff did not have Parkinsonism symptoms at that time.

35.    On or about October 29, 2020, Defendant Behman ordered a Basic Metabolic panel for Plaintiff, after Plaintiff's complaint regarding the lump on his throat.[6]

36.    On or about December 3, 2020, Suburban Community Hospital preformed a CT scan[7] on Plaintiff.

---

[2] A clinical syndrome is a collection of physical and laboratory findings which are, often, viewed as part of a primary disease process.
[3] As defined by the National Institutes of Health (NIH).
[4] Hyperkinetic refers to movements of dyskinesia, which are excessive, repetitive, involuntary movements that disrupt the normal motor activity of the body. Hypokinetic refers to akinesia (lack of movement), hypokinesia (reduced amplitude of movements), bradykinesia (slow movement), and rigidity. See Western University, Movement Disorders.
[5] As defined by the National Institute of Aging (NIA) and the Alzheimer's Association.
[6] A basic metabolic panel is a blood test including seven or eight biochemical tests. This is a common laboratory test ordered by doctors.
[7] CT is an abbreviation for a computed tomography scan. This is medical imaging that is used to obtain detailed internal images of the body.

37.    On or about December 31, 2020, Defendant Behman requested a follow up of the CT scan.

38.    Upon information and belief at some point during these visits, Defendant Behman asked Plaintiff to hold his hands up, to the side, and forward without explanation as to the reason for this type of physical examination.

39.    Upon information and belief, a week after this physical examination, Defendant Behman informed Plaintiff that he had Parkinsonism and early onset of dementia. Prior to these diagnoses, Plaintiff was never sent to a neurologist, nor did he see any other specialist regarding Parkinsonism or dementia.

40.    Upon information and belief, when Plaintiff learned of this diagnosis, Defendant Behman also informed Plaintiff that he would need to be on medication for the rest of his life and his symptoms would only worsen.

41.    Previously, Plaintiff was always an active and athletic individual and had never experienced any problems associated with Parkinsonism, such as shaking and difficulty moving.

42.    Prior to Defendant Behman's diagnosis, Plaintiff had no symptoms that would lead him to anticipate this diagnosis.

43.    During an appointment with Defendant Behman, Defendant Behman prescribed Sinemet[8], which Plaintiff received on or about February 18, 2021.

44.    Upon information and belief, after two to three weeks of taking Sinemet in the morning and evening (one 25/100 mg twice a day), Plaintiff reported that he was experiencing tremors in his hands, uncontrolled bouts of jumpiness, and wetting his bed during the night. Due to these

---

[8] Sinemet is the brand name for Carbidopa / Levodopa, which is a dopamine promotor used to treat Parkinson's disease. The medicine aids in improving slow movement, muscle stiffness, and shaking.

symptoms, Plaintiff asked to see Defendant Behman because he did not understand what was happening to his bodily movements or functions.

45.     Upon information and belief, Defendant Behman concluded that Plaintiff's dosage of Sinemet needed to be increased, which occurred during at a Chronic Care Clinical appointment with Defendant Behman on or about March 19, 2021.

46.     Defendant Behman increased Plaintiff's dosage of Sinemet to two tablets twice a day on or about March 19, 2021.

47.     After a month of this increased dosage of Sinemet, Plaintiff suffered severe tremors in his hands and legs; both his hands and legs would "jump" involuntarily. Furthermore, Plaintiff suffered from depression and anxiety due to his deteriorating physical state.

48.     On or about April 14, 2021, Plaintiff was informed by CRNP[9] Jillian Zimmerman that Seroquel[10], which Plaintiff had been prescribed for his mental health at MCCF since 2019, can lead to Parkinsonism when taken at high doses. The idea of temporarily halting the administration of Sinemet was mentioned and a checkback was scheduled for the following week to re-access.

49.     No subsequent change was made during this "checkback."

50.     After the passage of two more months, Plaintiff had great difficulty walking.

51.     On or about May 4, 2021, Plaintiff had an appointment with CRNP Matthew Geer from the psychology department to re-assess his tremors and Parkinsonism.

---

[9] CRNP is an acronym for Certified Registered Nurse Practitioner. A CRNP is a registered nurse (RN) who has advanced education and clinical training in a specialized area of health care.
[10] Seroquel is the brand name of Quetiapine, which is an antipsychotic used to treat schizophrenia, bipolar disorder, and depression. In some cases, it can cause Parkinson's like symptoms, as well as hallucinations.

52.     On or about May 4, 2021, Defendant Behman prescribed Cogentin (one 0.5 mg tablet twice a day) for Plaintiff and discontinued Sinemet.[11]

53.     On or about May 11, 2021, and/or May 13, 2021, Defendant Behman provided a full examination of Plaintiff regarding hypertension, Parkinsonism, asthma, hypercholesterolemia, GERD, and an external hemorrhoid. Defendant Behman made a note in Plaintiff's medical records that a hold was placed on the Sinemet medication while the psychology department addressed the possibility that the medication was causing the tremors. Further, a note was placed in his file that a consultation with neurology may be required prior to re-commencing the use of Sinemet.

54.     Upon information and belief, neither Defendant Behman nor any other medical department personnel scheduled an appointment for Plaintiff to consult with a neurologist while he was housed at MCCF.

55.     Because Plaintiff's symptoms did not improve, Defendant Behman changed the dosage of his medication on or about May 14, 2021, at which time Plaintiff received two 25/100 mg tablets of Sinemet twice a day and one 0.5 mg tablet of Cogentin twice a day. Plaintiff was given a cane to assist with his mobility issues at this time.

56.     While Plaintiff informed CRNP Geer on or about May 18, 2021, that he felt better since his last appointment, on or about May 19, 2021, Defendant Behman increased Plaintiff's dosage of Cogentin to two tablets twice a day, which continued to remain the consistent dosage going forward.

57.     On or about June 11, 2021, Defendant Behman increased Plaintiff's dosage of Sinemet to two tablets three times a day.

---

[11] Cogentin is the brand name for Bensatropine, which is an anti-tremor medication used to treat Parkinson's disease and the side effects of other drugs.

58.    After this increase in his medication, Plaintiff's shaking worsened, and he became incontinent, during the day and night.

59.    From June 2021 to November 14, 2021, the MCCF medical department did not consistently give Plaintiff his prescription for Sinemet.

60.    On or about November 14, 2021, Defendant Behman increased Plaintiff's prescription to two tablets of Sinemet four times a day.

61.    During this time, Plaintiff's symptoms continued to worsen. He was not able to conduct himself well either when he went to court or during day-to-day activities. His ability to walk continued to deteriorate; he was unable to hold his utensils during meals because his hands were shaking; and his mental health declined to the point that he contemplated suicide.

62.    On or about January 10, 2022, and January 13, 2022, Plaintiff requested a consultation with Defendant Behman regarding his dosage of Sinemet.

63.    On or about January 13, 2022, upon information and belief, Defendant Behman prescribed Plaintiff   Aricept[12] for dementia (one 5 mg tablet once daily).

64.    On or about January 25, 2022, Plaintiff requested adult diapers from the medical department for his incontinence issues.

65.    On or about February 8, 2022, Defendant Behman saw Plaintiff to discuss options for pain management in relation to the Parkinsonism diagnosis; however, no changes were made to Plaintiff's treatment.

---

[12] Aricept is the brand name of Donepezil, which is a cognition-enhancing medication, often used for patient's diagnosed with Alzheimer's disease or dementia. This medication is used to improve attention, memory, and the ability to engage in daily activities.

66.     On or about February 23, 2022, Plaintiff slipped and fell down the stairwell at MCCF due to his instability issues. Plaintiff fell four to five stairs, landed on his right side, and reported back pain. Plaintiff was transported to Suburban Community Hospital for treatment.

67.     Upon his return to MCCF on or about February 24, 2022, Plaintiff's tremors increased.

68.     On or about March 10, 2022, Plaintiff was again transported to Suburban Community Hospital after suffering another fall.

69.     On or about March 14, 2022, Plaintiff requested to speak to Defendant Behman regarding his increased falls and subsequent pain management.

70.     Defendant Behman did not change Plaintiff's treatment and medication while he was in MCCF, and it remained unchanged until the time of his transfer to the Pennsylvania Department of Corrections in March 2022. He continued to experience instability, tremors, and pain in his muscles, bones, and tissue.

71.     While Plaintiff was incarcerated at MCCF, Defendant Behman never took any steps for Plaintiff to consult with a neurologist to diagnose and treat his medical conditions.

72.     Upon information and belief, Defendant Behman's decision to treat Plaintiff for Parkinsonism and dementia without sending him for an evaluation by a neurologist caused Plaintiff to suffer severe pain, discomfort and permanent impairment, including but not limited to, tremors, hallucinations, insomnia, and instability.

### D.     Medical Treatment Provided at SCI Benner Township for Undiagnosed Neurological Condition, Knee Injury, and ADA Compliance in Care

73.     On or about March 21, 2022, Plaintiff was transferred to the Department of Corrections after being sentenced to eight to twenty years in prison stemming from a criminal conviction in Montgomery County, Pennsylvania.

13

74.    Plaintiff was first housed at SCI Smithfield. While Plaintiff was housed there, the medical department continued his medication and provided a handicapped cell, cane, and wheelchair.

75.    On or about April 26, 2022, Plaintiff was unable to stand for longer than ten to fifteen seconds. He was unable to walk with either a cane or a walker due to instability.

76.    During an on-site consultation on or about May 4, 2022, while Plaintiff was housed at SCI Camp Hill, the Medical Department noted the diagnoses of Parkinsonism, dementia, and muscle spasms. The SCI Camp Hill Medical Department recommended and approved Plaintiff for a walker, physical therapy, and a neurological consultation.

77.    On or about June 6, 2022, SCI Benner Township Medical Department conducted an entry examination of Plaintiff. Upon information and belief, Plaintiff informed the Medical Department that he did not believe he suffered from either Parkinsonism or dementia.

78.    On or about June 6, 2022, the medical director of SCI Benner Township, Dr. LeClerc, discontinued Sinemet and Aricept because he did not find any evidence indicative of Parkinsonism upon examination; however, Plaintiff remained on Cogentin.

79.    On or about August 6, 2022, Plaintiff requested a cane instead of his walker since he felt that his ambulation was improving.

80.    On or about October 26, 2022, the SCI Benner Township Medical Department ordered a brain MRI for Plaintiff through National Diagnostic Imaging with and without contrast.[13]

81.    On or about December 22, 2022, Defendant Howard met with Plaintiff during a clinical appointment. She informed Plaintiff that the MRI results of his brain looked normal, and the best course of action was to wait for the consultation with neurology to determine treatment for his tremors.

---

[13] An MRI with contrast may be used to identify the presence of larger tumors, while a MRI with contrast will detect smaller tumors as well as how far the tumors may extend into the surrounding tissue.

82.     On or about January 24, 2023, Plaintiff underwent a tele-neurology assessment at SCI Benner Township with AHN Neurology. During this assessment, Plaintiff communicated that his symptoms were improving as he was weaned off Sinemet and Aricept; however, he was unable to ambulate with a steady gait, and that he had to use a cane and wear adult diapers, and that his left leg bounced uncontrollably.

83.     The neurology assessment concluded that Plaintiff's atypical gait was not due to Parkinsonism; however, he may have lumbosacral etiology.[14] Further, it was determined that his MRI brain scan was "unremarkable" and consistent with a normal brain scan of an individual of his age (early thirties).

84.     Following Plaintiff's January tele-neurology assessment, AHN Neurology recommended an MRI, which occurred on or about February 15, 2023. National Diagnostic Imaging conducted the MRI for Plaintiff's spine, to help identify the cause of pain in both of his legs and lower back.

85.     On or about March 10, 2023, Plaintiff received the results of an MRI for his back pain, which showed degeneration with central and left paramedian protrusion of the L5-S1 disc into the epidural fat without central or neural foraminal.

86.     On or about April 21, 2023, SCI Benner Township granted Plaintiff a handicapped cell due to his inability to get on and off the toilet without assistance.

87.     On May 17, 2023, Plaintiff was seen by Physician Assistant Derek Paul Rockwell of the Neurology Department at Geisinger Medical Center in Danville. He recommended physical therapy and a follow up appointment with neurology to determine the cause of Plaintiff's tremors.

88.     On or about July 10, 2023, during a psychological examination at SCI Benner Township, Plaintiff admitted that he was still in great pain and was suffering from agoraphobic tendencies

---

[14] A condition that is often caused by a degenerative change such as disc herniation, ligamentum flavum changes, facet hypertrophy, or spondylolisthesis, leading to nerve root compression. See NIH.

because he feared his body would fail him. It was also noted that Plaintiff was in a depressed state of mind and admitted to spending his days watching television in his cell.

89.    On or about July 27, 2023, Plaintiff was transported to the Mount Nittany Health Pain Management Center at the request of neurology to determine whether Plaintiff was a candidate for an epidural steroid injection. Furthermore, the documentation from this examination stated that Plaintiff was "wrongfully diagnosed" with Parkinsonism and Alzheimer's disease.

90.    On or about August 4, 2023, Plaintiff fell in his cell at SCI Benner when he lost his balance due to severe tremors, and landed on and injured his right knee.

91.    Plaintiff was taken for emergency care to Mount Nittany Medical Center, where an MRI was performed, and he was diagnosed with a laterally dislocated patella and a torn meniscus.

92.    On or about August 5, 2023, Mount Nittany Medical Center performed arthroscopy[15], chondroplasty[16], open medial patellofemoral ligament and retinacular repair[17] on Plaintiff's right knee.

93.    Upon discharge, the Mount Nittany doctor ordered Plaintiff to wear a postoperative brace to provide support to his right knee when walking, standing, and transferring his weight. The doctor also ordered that Plaintiff use crutches until he could safely walk without a limp.

94.    From August 8, 2023, to on or about August 15, 2023, Plaintiff was admitted to Encompass Health Rehabilitation Hospital of Nittany Valley where he received rehabilitation treatment for his knee.

---

[15] Arthroscopy is a surgical procedure that surgeons use to visualize and treat problems inside a joint.
[16] Chondroplasty is a surgical procedure used to repair and reshape damaged cartilage in a joint.
[17] A surgery in which a new medial patellofemoral ligament (a ligament extending from the femur to the patella in the leg/knee) is created to stabilize a knee and protect a joint.

95.     On or about August 31, 2023, when Plaintiff was examined for a surgical follow up at Mount Nittany Physician Group, Plaintiff remained in great pain and had difficulty moving his right leg. Physical therapy was recommended two to three times per week.

96.     On or about September 15, 2023, Plaintiff saw neurologist Dr. Benjamin B. Pollock at Geisinger Medical Center. Dr. Pollock found no evidence that Plaintiff suffered from Parkinson's disease and that Plaintiff should remain only on pain medication, which included gabapentin. Upon information and belief, the neurologist recommended two years of intensive physical therapy and two years of intensive occupational therapy, as well as a follow up if Plaintiff's symptoms persisted, which never occurred.

97.     No other diagnosis was provided by the neurologist. As of the date of the filing of this complaint, Plaintiff has not been further examined or followed up by a neurologist since the September 2023 examination.

98.     On or about September 22, 2023, Plaintiff was temporarily transferred to SCI Mercer for knee rehabilitation in an ADA compliant handicap van, in a wheelchair with his right leg elevated.

99.     On or about September 28, 2023, Plaintiff did receive some physical therapy, but he was still unable to bend his right knee without significant pain, as noted by the physical therapist at SCI Mercer.

100.     On or about October 13, 2023, Plaintiff was discharged from SCI Mercer and transferred back to SCI Benner Township.

101.     On the same date when Plaintiff was transported back to SCI Benner Township (which is a two-and-a-half-hour trip), he was taken in a Dodge Caravan Minivan because the handicapped accessible van was not available. The two corrections officers, Defendants John Doe 1 and John Doe 2, forced Plaintiff to lay across the backseat with his leg elevated, his right foot resting on the

back passenger window, and his head leaning on the driver's side window. He was unable to wear a seatbelt.

102.    Upon information and belief, shortly after the vehicle left SCI Mercer, the driver, Defendant John Doe 1, took a sharp turn causing Plaintiff's right leg to fall between the seats and twist. Because Plaintiff was shackled, he was unable to readjust his leg, which resulted in it becoming numb by the time that the minivan reached SCI Benner Township. During the trip, Defendants John Doe 1 and John Doe 2 refused to pull to the side of the road to assist Plaintiff.

103.    When they arrived at SCI Benner Township, a corrections officer, Defendant John Doe 3, met the vehicle to perform a security check prior to entering the facility.

104.    Neither Defendants John Doe 1 nor John Doe 2 informed Defendant John Doe 3 how Plaintiff was positioned in the vehicle.

105.    When Defendant John Doe 3 opened the back door, Plaintiff's shoulder was caught in the door frame as Defendant John Doe 3 proceeded to try and slam the door shut approximately eight times. The door continuously hit and injured Plaintiff in the shoulder, back, and neck.

106.    On or about October 16, 2023, Plaintiff was taken to Mount Nittany Hospital's Emergency Department, due to the swelling of his right leg from it being twisted while being transported three days prior.

107.    Two corrections officers, Defendants John Doe 4 and John Doe 5, transported Plaintiff to Mount Nittany Hospital via the same Dodge Caravan Minivan that lacked handicapped accommodations. During this transport, Defendants John Doe 4 and John Doe 5 placed Plaintiff on the floor of the vehicle, again with no seatbelt. Plaintiff was fearful for his life due to this unsecured method of transportation during the twenty-five-minute drive to Mount Nittany Hospital.

108.    Defendants John Doe 4 and John Doe 5 returned Plaintiff to SCI Benner Township on the same day at which time Plaintiff was unable to bend his right knee.

109.    Defendants Houser and Booher, as superintendents at SCI Benner Township, manage and/or are employed by the Pennsylvania Department of Corrections and in their positions as supervisors and/or employees, knew or should have known how a prison system operates and were aware of the need to have policies in place pertaining to keeping inmates safe and free from harm, including properly transporting prisoners in an ADA complaint manner, as described above.

110.    Reasonably trained corrections personnel, which includes the DOC Defendants, should be aware of their responsibilities to regularly ensure the well-being and safety of inmates who are under their charge.

111.    On or about October 17, 2023, the SCI Benner Township Medical Department discontinued the use of Plaintiff's knee immobilizer/brace and provided a cane to assist Plaintiff's ambulation.

112.    Upon his return to general population, the Medical Department did not authorize a handicapped cell for Plaintiff, and he was placed in a non-ADA compliant cell with a cellmate.

113.    On or about November 7, 2023, Defendant Howard refused Plaintiff access to a walker, cane or a wheelchair for long distances despite the fact that Plaintiff informed her that he needed the support for his tremors and weak right knee.

114.    Defendant Howard also discontinued all of Plaintiff's pain medication, only allowing him to take Tylenol, despite Plaintiff telling her that he was in extreme pain.

115.    On or about November 29, 2023, Plaintiff submitted a sick slip stating that he was in pain, including pain in his back and a swollen right leg, which would not bend properly. The SCI Benner

Township Medical Department informed him that an orthopedic appointment would be scheduled in the near future.

116.    On or about January 10, 2024, Plaintiff submitted a formal request for ADA accommodations at SCI Benner Township through his attorney. The accommodations requested included but were not limited to: access to a handicapped cell, a walker, wheelchair, and caregiving assistance from other inmates.

117.    On or about May 28, 2024, the Central Office Inmate Disability Accommodation Committee denied Plaintiff's request to be supplied with a walker, wheelchair, handicapped cell, and assistance from inmates because the SCI Benner Township Medical Department did not approve the accommodations and stated that Plaintiff should file grievances regarding this issue.

       **E.**     **Medical Defendants' Failure to Properly Treat Plaintiff's Neurological Issue and Knee Injury**

118.    As of the filing date of this complaint, Plaintiff still has not received his much-needed full neurological workup, physical therapy, or occupational therapy; and as a result, he has continued to suffer with severe pain, tremors, difficulty with his motor skills, and severe instability for almost four years.

119.    Plaintiff continues to suffer side effects which, upon information and belief, began as a result of the medication prescribed by Defendant Behman, including but not limited to, tremors, hallucinations, insomnia, and instability.

120.    Plaintiff continues to have difficulty extending his right knee and bearing weight on that side of his body. Plaintiff's safe ambulation requires him to use a cane, walker and/or a wheelchair, which are still unavailable to him. Plaintiff continues to be unstable, in severe pain, and suffers from tremors when he walks.

121.    As a result of Plaintiff's continued issues with his knee and the delay in getting him subsequent knee surgery, Plaintiff's right knee is swollen, painful and unstable.

122.    Due to the continued denial of ADA accommodations, Plaintiff experiences instability, constant risk of falling, and humiliation.

### V.    ADMINISTRATIVE REMEDIES

123.    The allegations set forth in paragraphs 1 through 122 are incorporated as if fully set forth herein.

124.    Plaintiff has fully exhausted all administrative remedies while incarcerated at MCCF and the Pennsylvania Department of Corrections, including SCI Benner Township.

### VI.    CLAIMS FOR RELIEF

**A.    First Cause of Action: Denial of Medical Treatment**
**Plaintiff v. Medical Defendants,**
**Federal Constitutional Claims**

125.    The allegations set forth in paragraphs 1 through 124 are incorporated as if fully set forth herein.

126.    The foregoing conduct of the Medical Defendants, acting under color of state law, was undertaken in concert and conspiracy and as part of an effort to unlawfully deny Plaintiff medical treatment and otherwise deprive Plaintiff of his civil and constitutional rights, including his rights, privileges, and immunities under the Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

127.    Because of his need for a thorough neurological evaluation, physical and occupational therapy, and proper knee rehabilitation/surgery, Plaintiff has suffered with severe pain for almost four years, since his diagnoses of Parkinsonism and dementia at MCCF in December 2020 and transfer to the Department of Corrections in March 2022.

128.    Each Medical Defendant was aware of Plaintiff's serious medical needs.

129.    The seriousness of Plaintiff's medical needs was obvious to the Medical Defendants because of his documented alleged diagnoses of Parkinsonism and dementia, his knee injury, his pain, and his need for a cane and wheelchair because of his instability when walking.

130.    Plaintiff repeatedly emphasized the seriousness of his medical needs during his onsite medical consultations with the Medical Defendants.

131.    The actions and omissions of the Medical Defendants delayed Plaintiff's necessary diagnosis and medical treatment for non-medical reasons, including, but not limited to, the failure to properly evaluate and treat his neurological issues, failure to provide proper treatment for his right knee, and other circumstances attendant to the breakdown in communication among the Medical Defendants regarding the continuity of Plaintiff's care, as well as the severity and urgency of his medical needs.

132.    As a direct and proximate result of the Medical Defendants' actions and omissions, Plaintiff suffered serious mental and physical injuries with unknown long-term ramifications.

133.    The acts and omissions of the Medical Defendants were committed willfully, wantonly, maliciously, intentionally, outrageously, deliberately, and/or by conduct so egregious as to shock the conscience.

134.    The acts and omissions of the Medical Defendants were committed without cautious regard for due care, and with such wanton and reckless disregard of the consequences as to show the Defendants' indifference to the seriousness of Plaintiff's medical needs and the risk of serious harm.

135.    The Medical Defendants conspired to inflict harm on Plaintiff and deprive him of his constitutional rights.

136.    The Medical Defendants violated Plaintiff's constitutional rights by causing him harm through their protracted delay of his necessary and proper medical treatment.

137.    As a direct and proximate result of the Medical Defendants' illegal and unconstitutional actions, Plaintiff suffered pain, fear, anxiety, physical injuries, severe emotional trauma, and the loss of the enjoyment of life, all to his great detriment and loss.

138.    As a direct and proximate result of the Medical Defendants' illegal and unconstitutional actions, Plaintiff suffered and continues to suffer financial loss and deprivation of other liberty interests, all to his great financial detriment and loss.

**B.    Second Cause of Action: State Law**
**Negligence Claims**
**Plaintiff v. Medical Defendants**

139.    The allegations set forth in paragraphs 1 through 138 are incorporated as if fully set forth herein.

140.    The Medical Defendants have the duty to comply with generally accepted medical standards of care in their medical treatment of Plaintiff, which were violated when they neglected to take Plaintiff to a specialist for evaluation, diagnosis and treatment.

141.    The Medical Defendants' violation of their duty of care to Plaintiff was a direct and proximate cause and a substantial factor in bringing about Plaintiff's damages, as outlined above, and as a result, the Medical Defendants are liable to Plaintiff.

142.    Because the individual Medical Defendants were acting as agents, servants and/or employees of Defendants Wellpath and PrimeCare, and because the Medical Defendants were acting within the scope and course of their employment, and under the direct control and supervision of Defendants Wellpath and PrimeCare, Defendants Wellpath and PrimeCare are liable to Plaintiff on the basis of *respondeat superior* liability.

C.    Third Cause of Acton: Monell Claims
      Plaintiff v. PrimeCare Medical, Inc.

143.    The allegations set forth in paragraphs 1 through 142 inclusive, are incorporated as if fully set forth herein.

144.    The violations of Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, Plaintiff's damages, and the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendant PrimeCare which has, with deliberate indifference failed to establish policies, practices and procedures to ensure that inmates at  MCCF receive appropriate care for serious illnesses and, if necessary, timely outside medical services.

145.    As a direct and proximate result of Defendant PrimeCare's above-described unlawful and malicious conduct, committed under color of state law, and while acting in that capacity, Defendant PrimeCare deprived Plaintiff of the equal protection of the laws and Plaintiff's rights, privileges and immunities under the laws and the Constitution of the United States, Plaintiff's right to adequate medical care, to be secure in one's person and property and to due process and equal protection of the law, all to Plaintiff's great detriment and loss. As a result, Plaintiff suffered grievous harm, in violation of his rights under the laws and Constitution of the United States and in particular, the Eighth and Fourteenth Amendments thereof and 42 U.S.C. § 1983.

146.    As a direct and proximate result of the acts and omissions of Defendant, Plaintiff was forced to endure great pain and mental suffering and was deprived of physical liberty and adequate medical care, all to Plaintiff's great detriment and loss.

147.    Defendant PrimeCare permitted, encouraged, tolerated, ratified and was deliberately indifferent to a pattern, practice and custom of:

        a.    Failure to provide adequate medical care to inmates suffering from

24

serious medical conditions;

b.     Staffing medical personnel unfit to provide proper medical attention and care;

and,

c.     Failure of medical personnel to prevent, deter, report or take action against the

unconstitutional actions of other medical personnel of PrimeCare, that violate the

constitutional rights of inmates as presented herein.

148.   Defendant PrimeCare was deliberately indifferent to the need to:

a.     Provide proper medical care to inmates with serious medical conditions;

b.     Monitor medical personnel whom it knew or should have known were

failing to provide proper medical treatment to inmates with serious medical conditions;

c.     Train its medical personnel in the appropriate exercise of medical procedures;

d.     Facilitate, encourage, tolerate, ratify and/or was deliberately indifferent to the

needs of inmates with serious medical conditions regardless of financial constraints; and,

e.     Failure to properly train, supervise and discipline medical personnel who do not

follow proper medical protocol.

149.   Defendant PrimeCare was deliberately indifferent to the need for more or different

training, supervision, investigation or discipline in the areas of:

a.     Proper identification of serious medical conditions;

b.     Exercise of their medical knowledge; and,

c.     Giving proper medical treatment to inmates with serious medical needs.

150.   The foregoing acts, omissions, systemic deficiencies and deliberate indifference to the

danger or harm to inmates like Plaintiff and the need for more or different training, investigation

and discipline are policies and customs of PrimeCare and have caused medical personnel,

including the Medical Defendants, to believe that they can violate the rights of inmates, with impunity with the foreseeable result that medical staff are more likely to violate the constitutional rights of inmates.

### D. Fourth Cause of Action: Monell Claims
   Plaintiff v. Wellpath, LLC

151.    The allegations set forth in paragraphs 1 through 150 inclusive, are incorporated as if fully set forth herein.

152.    The violations of Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, Plaintiff's damages, and the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendant Wellpath which has, with deliberate indifference failed to establish policies, practices and procedures to ensure that inmates at SCI Benner Township receive appropriate care for serious illnesses and, if necessary, timely outside medical services.

153.    As a direct and proximate result of Defendant Wellpath's above-described unlawful and malicious conduct, committed under color of state law, and while acting in that capacity, Defendant Wellpath deprived Plaintiff of the equal protection of the laws and Plaintiff's rights, privileges and immunities under the laws and the Constitution of the United States, Plaintiff's right to adequate medical care, to be secure in one's person and property and to due process and equal protection of the law, all to Plaintiff's great detriment and loss. As a result, Plaintiff suffered grievous harm, in violation of his rights under the laws and Constitution of the United States and in particular, the Eighth and Fourteenth Amendments thereof and 42 U.S.C. § 1983.

154.    As a direct and proximate result of the acts and omissions of Defendant, Plaintiff was forced to endure great pain and mental suffering and was deprived of physical liberty and adequate medical care, all to Plaintiff's great detriment and loss.

26

155.    Defendant Wellpath permitted, encouraged, tolerated, ratified and was deliberately indifferent to a pattern, practice and custom of:

    a.    Failure to provide adequate medical care to inmates suffering from serious medical conditions;

    b.    Staffing medical personnel unfit to provide proper medical attention and care; and,

    c.    Failure of medical personnel to prevent, deter, report or take action against the unconstitutional actions of other medical personnel of Wellpath, that violate the constitutional rights of inmates as presented herein.

156.    Defendant Wellpath was deliberately indifferent to the need to:

    a.    Provide proper medical care to inmates with serious medical conditions;

    b.    Monitor medical personnel whom it knew or should have known were failing to provide proper medical treatment to inmates with serious medical conditions;

    c.    Train its medical personnel in the appropriate exercise of medical procedures;

    d.    Facilitate, encourage, tolerate, ratify and/or was deliberately indifferent to the needs of inmates with serious medical conditions regardless of financial constraints; and,

    e.    Failure to properly train, supervise and discipline medical personnel who do not follow proper medical protocol.

157.    Defendant Wellpath was deliberately indifferent to the need for more or different training, supervision, investigation or discipline in the areas of:

    a.    Proper identification of serious medical conditions;

    b.    Exercise of their medical knowledge; and,

    c.    Giving proper medical treatment to inmates with serious medical needs.

158.    The foregoing acts, omissions, systemic deficiencies and deliberate indifference to the danger or harm to inmates like Plaintiff and the need for more or different training, investigation and discipline are policies and customs of Wellpath and have caused medical personnel, including the Medical Defendants, to believe that they can violate the rights of inmates, with impunity with the foreseeable result that medical staff are more likely to violate the constitutional rights of inmates.

159.    The actions of all Defendants, acting under color of state law and/or in concert or conspiracy with each other, deprived Plaintiff of his rights, privileges and immunities under the laws and Constitution of the United States, in particular, the rights to be free from bodily harm and the right to receive proper medical care.

160.    Defendant Wellpath, Defendant PrimeCare, and the individual named Defendants, acting in concert and conspiracy with each other, have by the aforementioned actions, deprived Plaintiff of his constitutional and statutory rights by the Defendants' failure to send Plaintiff out to specialists when appropriate for a proper evaluation, diagnosis and a treatment plan.

161.    By these actions, all Defendants have deprived Plaintiff of his rights secured by the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

        **E.    Fifth Cause of Action: ADA Compliance Violations**
              **Plaintiff v. DOC Defendants Houser, Booher, and John Does 1 through 5**

162.    The allegations set forth in paragraphs 1 through 161 inclusive are incorporated as if fully set forth herein.

163.    The foregoing conduct of Defendants Houser, Booher, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5, which caused Plaintiff to suffer severe physical pain and emotional distress to an unconscionable degree and well in excess of that which normally attends

prison life, occurred while Defendants were acting under color of state law and deprived Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

164.    Defendant Houser was deliberately indifferent to Plaintiff's physical well-being by allowing employees under his supervision to inappropriately transfer Plaintiff in a non-ADA compliant vehicle and inflict bodily injury during travel and loading and unloading of the vehicle.

165.    The foregoing conduct of Defendant Houser, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

166.    Defendant Booher was deliberately indifferent to Plaintiff's physical well-being by allowing employees under his supervision to inappropriately transfer Plaintiff in a non-ADA compliant vehicle and inflict bodily injury during travel and loading and unloading of the vehicle.

167.    The foregoing conduct of Defendant Booher, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

168.    Defendant John Doe 1 was deliberately indifferent to Plaintiff's physical well-being by allowing his transport in a non-ADA compliant vehicle without being restrained by a seatbelt.

169.    The foregoing conduct of Defendant John Doe 1, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

170.    Defendant John Doe 2 was deliberately indifferent to Plaintiff's physical well-being by allowing his transport in a non-ADA compliant vehicle without being restrained by a seatbelt.

171.    The foregoing conduct of Defendant John Doe 2, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

172.    Defendant John Doe 3 was deliberately indifferent to Plaintiff's physical well-being by assaulting Plaintiff multiple times by opening and closing the door of the non-ADA compliant vehicle against Plaintiff's neck, back, and shoulder.

173.    The foregoing conduct of Defendant John Doe 3, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

174.    Defendant John Doe 4 was deliberately indifferent to Plaintiff's physical well-being by allowing his transport in a non-ADA compliant vehicle without being restrained by a seatbelt.

175.    The foregoing conduct of Defendant John Doe 4, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

176.    Defendant John Doe 5 was deliberately indifferent to Plaintiff's physical well-being by allowing his transport in a non-ADA compliant vehicle without being restrained by a seatbelt.

177.    The foregoing conduct of Defendant John Doe 5, acting under color of state law, was undertaken to deprive Plaintiff of his civil and constitutional rights, including Plaintiff's rights, privileges and immunities under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

178.    The violations of Plaintiff's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, Plaintiff's damages and the conduct of Defendants Houser, Booher, John Doe 1, John Doe 2, John Doe 3, John Doe 4,and John Doe 5, were directly and proximately caused by Defendants' actions and/or inactions, which have, with deliberate indifference, failed to establish policies, practices, procedures and training regarding: the improper transport of Plaintiff in a non-ADA compliant vehicle.

179.    As a direct and proximate result of Defendants Houser, Booher, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5's illegal and unconstitutional actions, Plaintiff suffered

pain and injury to his neck, back, arm, and knee, pain, fear, anxiety, physical injuries, severe emotional trauma, and the loss of the enjoyment of life, all to his great detriment and loss.

### F.  Sixth Cause of Action: Federal Constitutional Claims Plaintiff v. DOC Defendants Houser, Booher, and John Does 1 through 5

180.  Plaintiff incorporates paragraphs 1 through 179 of this complaint as though fully set forth herein.

181.  The violations of Plaintiff's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, Plaintiff's damages and the conduct of Defendants were directly and proximately caused by the actions and/or inactions of Defendants Houser, Booher, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5, which have, with deliberate indifference, failed to establish policies, practices, procedures and training regarding the transportation of inmates in an ADA compliant manner.

### G.  Exclusion from Services of a Public Entity in Violation of the Americans with Disabililties Act v. DOC Defendants

182.  Plaintiff incorporates paragraphs 1 through 181 of this complaint as though fully set forth herein.

183.  Defendants Houser, Booher, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 failed to accommodate Plaintiff by not providing him transportation in an ADA compliant vehicle, not providing a handicapped cell, and not providing proper ambulatory assistance at SCI Benner Township, a public entity, due to plaintiff's disability in violation of Title II and Title III of the Americans with Disabilities Act.

H.    **Exclusion from Services of a Federally Funded Entity in Violation of the Rehabilitation Act v. DOC Defendants**

184.    Plaintiff incorporates paragraphs 1 through 183 of this complaint as though fully set forth herein.

185.    Defendants Houser, Booher, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 failed to accommodate Plaintiff by not providing him transportation in an ADA compliant vehicle, not providing a handicapped cell, and not providing proper ambulatory assistance at SCI Benner Township, a public entity, due to plaintiff's disability in violation of Section 504 of the Rehabilitation Act.

## PUNITIVE DAMAGES

186.    Plaintiff incorporates paragraphs 1 through 185 of this complaint as though fully set forth herein.

187.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

188.    As a result of the actions of the individual Defendants, as discussed in the foregoing paragraphs, Plaintiff is entitled to punitive damages as to each cause of action.

## JURY DEMAND

189.    Plaintiff demands a jury as to each defendant and as to each count.

WHEREFORE, Plaintiff requests the following relief:

    a.    Compensatory damages;

    b.    Punitive damages;

    c.    Reasonable attorney's fees and costs; and

    d.    Such other and further relief that appears reasonable and just.

Respectfully submitted,

/s/ Laurie R. Jubelirer

Laurie R. Jubelirer, Esquire
Jubelirer Law, LLC
Attorney for Plaintiff

Date:  November 5, 2024

## **VERIFICATION**

I, Laurie R. Jubelirer, Esquire, attorney for Plaintiff herein, verify that the statements contained in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.  I understand that false statements herein are subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsifications to authorities.


**/s/ Laurie Jubelirer**
Laurie R. Jubelirer, Esquire
Attorney for Petitioner